IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JAMES SALEMBENE, Individually, | : | |
| and JAMES SALEMBENE and | : | |
| BERNADINE SALEMBENE | : | |
| | : | |
| v. | : | CIVIL NO. L-02-2576 |
| | : | |
| KRAUSE, INC., et al. | : | |

**MEMORANDUM**

Pending is the Defendants' Second Motion for Summary Judgment.[1] On December 13, 2005 and February 17, 2006, the Court held hearings on the Motion. For the following reasons, the Court will, by separate Order, DENY the Motion.

**I.     INTRODUCTION**

This is a products liability case. James Salembene sustained substantial injuries when he fell from a Krause ladder while he was painting his house. The cause of this fall is in dispute.

Krause argues that Mr. Salembene stretched unsafely above his head and to the right while attempting to reach the eaves of his house. He lost his balance and fell through no fault of the ladder. Mr. Salembene testified that his use of the ladder was safe and appropriate. He felt the ladder give to the left and compensated by moving to the right. He failed to regain his balance and fell approximately eighteen feet to the pavement.

---

[1] There are two defendants in this case: Costco Wholesale Corporation's ("Costco") and Krause, Inc. ("Krause"). Mrs. Salembene bought the ladder at Costco. The ladder was manufactured by Krause. The relationship between Krause and Costco is unclear.

On January 12, 2004, the Defendants filed a Motion for Summary Judgment. On September 30, 2004, the Court denied the Motion and asked the Plaintiffs to supplement their expert reports. The Plaintiffs did so, and, on May 2, 2005, the Defendants filed a Second Motion for Summary Judgment.

Because this is a products liability case, the plaintiff has the burden of proving that the proximate cause of his accident was a design or manufacturing defect in the ladder.[2] While a plaintiff would normally meet this burden through expert testimony, Mr. Salembene's efforts have been hampered because the ladder was lost. It is not clear which party is responsible for the loss, and all that remains as evidence are a few photographs taken by Krause's claim management firm.

Based on the photographs and Mr. Salembene's description of the accident, Mr. Salembene's experts posit two possible causes of the fall. First, John S. Morse, Ph.D testified that the fall is consistent with a defectively designed hinge. Dr. Morse concludes, however, that without examining the ladder itself, he cannot testify with a reasonable degree of engineering certainty that a defective hinge caused Mr. Salembene's accident. Second, Walter Gretz, P.E. is prepared to testify that Mr. Salembene's fall was consistent with a design or manufacturing defect in the plastic foot on the ladder's stabilizer bar.[3] Mr. Gretz also testified, however, that he cannot conclude with a reasonable degree of engineering certainty that the plastic foot on Mr. Salembene's ladder was defective without examining the ladder itself. Accordingly, Mr. Salembene cannot meet the burden of proof because neither of his experts can testify to a reasonable degree of engineering certainty that the ladder was defective.

This is not necessarily fatal to Mr. Salembene's case, however. When a party is responsible for losing evidence, the Court has the authority to sanction the party by issuing an

---

[2] Loh v. Safeway Stores, Inc., 422 A.2d 16, 23 (Md. Ct. Spec. App. 1980).

[3] Henry Belsky, counsel for Mr. Salembene, averred that this would be Mr. Gretz's testimony if the case went to trial. Mr. Gretz did not state this in his expert report, and he did not testify at the Court's hearings.

2

adverse jury instruction.[4]  If the jury finds that Krause was responsible for losing the ladder, it may infer that the evidence to be gleaned from an inspection of the ladder would be damaging to Krause.  Accordingly, the Court will deny the Defendant's Motion for Summary Judgement and allow the case to proceed to trial.

## II.     BACKGROUND

### A.     Facts

In 1989 or 1990, James Salembene purchased a twelve-foot Krause Multi-Matic articulating ladder.  The legs of the ladder connect to a horizontal stabilizer bar that runs parallel to the ground.  The bar extends beyond the legs of the ladder to provide stability.  Plastic orange feet attach to the ends of the stabilizer bar and rest on the ground.

On February 24, 2000, Mr. Salembene planned to paint the eaves of his house.  He set up his ladder in the fully upright position.  The plastic orange feet sat on a dry concrete surface.  The top of his ladder rested against the side of his house.

Mr. Salembene climbed the ladder and stood three to four rungs from the top.  With a paint brush in his right hand and his left hand on the paint bucket, Mr. Salembene **felt the ladder "give" on the left side.  Mr. Salembene tried to maintain his balance but fell approximately eighteen feet to the right**.  He fractured his skull and left arm and suffered various contusions.

Approximately two months after his fall, Mr. Salembene noticed a fracture on one of the plastic feet of the ladder's stabilizer bar.  The crack ran along the axis of the stabilizer bar.

Mrs. Salembene testified that she reported the accident to Krause and agreed to let Krause inspect the ladder.  A Krause representative instructed Mrs. Salembene to write

---

[4]     Silvestri v. General Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001).

"Salembene, James" and "RGA-050800-8" (a return goods authorization number) on the ladder and to tie the ladder with a strong cord. The Krause representative stated that Krause would arrange for UPS to pick up the ladder. Mrs. Salembene testified that she followed the instructions and that a uniformed individual came for the ladder.[5]

Krause acknowledges that Mrs. Salembene contacted the company and that it instructed her how to bind and mark the ladder. Krause concedes that it only issues a return goods authorization number, like the one provided to Mrs. Salembene, when it is arranging for a customer to return a ladder. Krause has no other information about the ladder, however. Krause's former Director of Operations, Edward Hansen,[6] testified that he searched through all of the returned ladders and the Krause files. He found no record that Krause received or inspected the ladder. UPS records do not show that the ladder was ever picked up. Krause has no record that it contacted UPS to retrieve the ladder.

The record is not entirely devoid of evidence about the ladder, however. Before the ladder was picked up, Krause's claims handling firm, Ladder Management, sent an investigator to the Salembene's house. The investigator, Travis Mozert, interviewed Mr. and Mrs. Salembene and photographed the ladder.

On August 6, 2002, Mr. Salembene filed the instant suit. On January 22, 2003, Krause informed the Court that it did not have the ladder and that there was no evidence that Krause

---

[5] In June 2000, Mr. Salembene requested a replacement ladder from Krause. Later that summer, Krause sent a new ladder. Edward Hansen, Krause's former Director of Operations, testified that Krause would usually, but not always, send a replacement ladder after receipt of the original ladder.

[6] Hansen was employed by Krause until Krause filed for bankruptcy. He is currently a consultant and assists St. Paul Surplus Lines (Krause's insurer) in defending product liability actions against Krause.

ever received the ladder.

### B. Costco's Expert

George H. Kyanka, Ph.D. testified that the cracked plastic foot did not cause Mr. Salembene's fall.[7] Dr. Kyanka stated that the crack in the stabilizer bar foot was inconsistent with Mr. Salembene's description of the accident. Mr. Salembene stated that the ladder lurched to the left. The crack, however, would be consistent with the ladder sliding away from the wall, not movement parallel to the wall. Dr. Kyanka concluded that Mr. Salembene's fall was caused by "his loss of balance while he was working in a difficult position high on the ladder using a long reach necessitated by the overhang and the steep roof slope."[8]

### C. Plaintiff's Experts

Dr. Morse testified that the fall was consistent with a defectively designed hinge. Mr. Salembene's ladder was equipped with zinc locking bolts. Dr. Morse stated that, based on his examination of other Krause ladders, "the zinc locking bolt and hinge design is defective and unreasonably dangerous."[9] Dr. Morse testified that if he could inspect the ladder he would look for physical damage to and foreign particles in the hinge. He would also manipulate the hinge to determine whether it was locking properly. Dr. Morse concluded, however, that without examining the ladder itself he cannot testify that a defective hinge caused Mr. Salembene's accident.

Plaintiffs' other expert, Mr. Gretz, disagrees with Dr. Kyanka. Mr. Gretz is prepared to

---

[7] Dr. Kyanka wrote his report after visiting the scene of the accident, reviewing photographs of Mr. Salembene's ladder and reading the reports of Plaintiffs' experts.

[8] Def.'s Mem. Supp. Summ. J. Ex. S.

[9] Def.'s Mem. Supp. Summ. J. Ex. O.

testify that Mr. Salembene's description of the fall was consistent with a design or manufacturing defect in the plastic foot on the ladder's stabilizer bar. Mr. Gretz stated that if the ladder was available he would use a Scanning Electron Microscope to see where on the foot the crack initiated and how the crack spread. Mr. Gretz would also conduct a chemical analysis to determine whether the wrong type of plastic was used to make the foot. Mr. Gretz testified in his expert report, however, that he cannot conclude that the plastic foot on Mr. Salembene's ladder was defective without examining the ladder itself.

### III.  STANDARD FOR SUMMARY JUDGMENT

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[10] Nevertheless, in determining whether there is a genuine issue of material fact, the Court must view the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party.[11]

### IV.  ANALYSIS

Mr. Salembene has asserted claims based on alleged design and manufacturing defects, a failure to warn, and strict liability. To succeed under a theory of products liability, Mr. Salembene has the burden of proving: (1) the existence of a defect; (2) the attribution of the

---

[10]  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial).

[11]  Pulliam Inv. Co. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987).

defect to the seller; and (3) a causal relationship between the defect and the injury.[12]  Normally, a plaintiff would meet this burden through expert testimony.

In a products liability case, when the product is missing, the law permits the Court to instruct the jury as to permissible inferences they might draw against the party who lost the product.[13]  The responsible party need not have acted in bad faith for the Court to give such an instruction.[14]

If the jury finds that Mr. Salembene was responsible for losing the ladder, either intentionally or negligently, then his claim must fail "as a matter of law" because he can offer no evidence to meet his burden.  If the jury finds Krause responsible, the jury must decide whether the loss was innocent or intentional.  If the loss was in bad faith, the Court will instruct the jury that it *must* infer that the ladder was defective and that the defect caused Mr. Salembene's fall.  If the loss was innocent, the Court will give an instruction that *allows* (but does not require) the jury to infer that the ladder was defective and that the defect caused the fall.[15]  If Krause is

---

[12]    Loh, 422 A.2d at 23.

[13]    Silvestri, 271 F.3d at 590.  Although Maryland law applies to the underlying claim, Federal law applies to the spoilation issue because "the power to sanction for spoilation derives from the inherent power of the court, not substantive law."  Id.

[14]    See Vodusek v. Bayline Marine Corp., 71 F.3d 148, 156 (4th Cir. 1995) ("While a finding of bad faith suffices to permit such an inference, it is not always necessary."); Anderson v. Litzenberg, 115 Md. App. 549, 561, 694 A.2d 150, 156 (1997).

[15]    Mr. Salembene requests the following jury instruction from the Maryland Civil Pattern Jury Instructions:

> The destruction of or the failure to preserve evidence by a party may give rise to an inference unfavorable to that party.  If you find that the intent was to conceal the evidence, the destruction or failure to preserve must be inferred to indicate that the party believes that his or her case is weak and that he or she would prevail if the evidence was preserved.  If you find

responsible for the missing ladder, such an instruction would adequately compensate for the loss of evidence.[16]

Accordingly, this case shall proceed to trial. A telephone conference has been scheduled for April 6, 2006, at 11:00 a.m. to discuss the pre-trial schedule.

## V.    CONCLUSION

For the reasons stated herein, the Court shall, by separate order, DENY the Defendants' Motion for Summary Judgment. (Docket No. 67).


Dated this 21st day of March, 2006.


                                                                                             _____/s/_____
                                                                                              Benson Everett Legg
                                                                                              Chief Judge

---

that the destruction or failure to preserve the evidence was negligent, you may, but are not required to, infer that the evidence, if preserved would have been unfavorable. <u>Maryland Civil Pattern Jury Instruction 1:8 - Spoilation</u>.

[16]    The parties must still brief whether UPS's loss of the ladder could be attributable to Krause.